IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PAUL OSSMAN,

     Plaintiff,

v.

MEREDITH CORPORATION,

     Defendant.

CIVIL ACTION FILE NO.:

1:19-cv-3200-SDG-JKL

## ORDER AND FINAL REPORT AND RECOMMENDATION

This is an employment discrimination case. Plaintiff Paul Ossman worked as a meteorologist for Defendant Meredith Corporation, a media company, at its Atlanta news station, CBS46. According to Defendant, he was fired for sexually harassing multiple female coworkers. Plaintiff, meanwhile, contends that he was fired because he is white, in violation of 42 U.S.C. § 1981. He also asserts a state law claim for breach of contract. The case is before the Court on Defendant's motion for summary judgment. [Doc. 62.] For the following reasons, it is **RECOMMENDED** that the motion be **GRANTED**.

## I.   SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is entitled to summary judgment.  *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that

precludes summary judgment." *Clark*, 929 F.2d at 608. The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## II.    BACKGROUND

### A.    Preliminary Considerations

In preparing the factual recitation below, the Court has considered Defendant's Statement of Undisputed Material Facts ("DSMF" [Doc. 62-2]), Plaintiff's Statement of Additional Material Facts ("PSAF" [Doc. 71-2]), and

Defendant's Additional Statement of Undisputed Material Facts ("DASMF" [Doc. 74-1]), as well as the responses thereto ("R-DSMF" [Doc. 71-1], "R-PSAF" [Doc. 74-2], "R-DASMF" [Doc. 75]); and, where possible, the Court has relied on those statements of facts and responses. The Court does not rule on each and every objection or dispute presented by the parties in this report and recommendation, and discusses objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact. The Court has also conducted its own review of the materials submitted in support, including the depositions and declarations filed in this case, and includes facts drawn from its independent review of the record. *See* Fed. R. Civ. P. 56(c)(3).

**B.    Plaintiff's Declaration**

Before turning to the facts of this case, the Court briefly addresses the declaration Plaintiff has filed in opposition to summary judgment. [*See* Doc. 71-3.] In it, he seeks to reverse or clarify testimony provided during his deposition because, he states, he was "tired" and may have "misheard" questions. [*Id.* ¶ 4.]

During summary judgment briefing, Defendant moved to strike the declaration as a sham. [*See* Doc. 72.] Although the Court was concerned by the declaration, Defendant's motion was denied because it was the improper vehicle

4

for challenging the declaration[1]; instead, the Court explained that it would disregard those portions that were relied upon by Plaintiff and properly objected to by Defendant.   [Doc. 73.]   Defendant provided those objections in response to Plaintiff's Statement of Additional Material Facts, and the Court, for the most part, takes up the substance of those objections as appropriate in factual recitation below.

Before doing so, the Court does take up two issues concerning Plaintiff's testimony.  First, he contends because that his counsel either "reserved" or "waived" the "reading and signing" of his deposition testimony, he was not allowed to complete the errata sheet or otherwise clarify that testimony, and could only correct his testimony by way of an affidavit at summary judgment.  [*See* Doc. 77-1 at 5-6 (citing Fed. R. Civ. P. 30(e)).]  Plaintiff is mistaken.

Rule 30(e)(1) of the Federal Rules of Civil Procedure provides:

> On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> (A) to review the transcript or recording; and

---

[1] For the same reasons, Plaintiff's motion for leave to respond to the motion to strike is also **DENIED**.  [Doc. 77.]  Even so, the Court has reviewed and will consider the substance of the arguments contained in both the motion to strike and the motion for leave to respond in ruling on evidentiary issues related to Plaintiff's declaration, which have been re-raised in Defendant's objections to Plaintiff's Statement of Additional Material Facts.  (*See* R-PSAF.)

> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e)(1).  If a deponent requests changes within that 30-day period, the court report "must attach any changes the deponent makes during the 30-day period."  Fed. R. Civ. P. 30(e)(2).  The advisory committee notes state that the reporter is in fact required "to make changes in the deposition if the deponent is not satisfied with it."  *Id.*, Adv. Comm. Notes, 1937 Adoption.

Nothing contained in the Rule, however, makes any reference to "waiving" or "reserving" the ability to review and make changes to a deposition, and Plaintiff has pointed to no authority that suggests that by "waiving" his right to review, change, and sign a deposition transcript, he gained unlimited license to make changes to that testimony at his convenience in the future.  To the contrary, the Eleventh Circuit has held that Rule 30(e) limits deposition changes to 30 days, *Welch v. Mercer University*, 304 F. App'x 834, 838 (11th Cir. 2008), and "many courts agree that substantive changes to deposition testimony are particularly suspect when they are offered in response to a motion for summary judgment," *ChemFree Corp. v. J. Walter, Inc.*, No. 1:04-CV-3711-JTC, 2008 WL 5234247, at *1 (N.D. Ga. Sept. 30, 2008).  Accordingly, the Court will not accept Plaintiff's

6

decision to refuse to review his deposition testimony and clarify any errors as a factor weighing in favor of accepting changes to that testimony.

Second, and more substantively, one of the issues at summary judgment is whether Plaintiff's discharge was justified by his violation of company policy, and Plaintiff's declaration is clearly intended to create a material issue of fact concerning the scope of Defendant's Discrimination and Harassment Policy and whether his conduct violated it.  Based upon the statements contained in the declaration, Plaintiff appears to argue that the Policy broadly prohibited any conduct that could be deemed harassing or hostile, and not just conduct based on a protected characteristic such as race or gender.  He additionally seems to argue that because Defendant did not prohibit coworkers from having relationships outside the workplace, only sexual harassment that physically occurred inside the actual workplace (and during work hours) came within the scope of the Policy.

As an evidentiary matter, however, Plaintiff is foreclosed from offering testimony now as to the scope of the Discrimination and Harassment Policy.[2]  At

---

[2] Plaintiff's assertion that Defendant's anti-harassment prohibitions stopped at the station's doors beggars credulity.  The Court need not belabor that issue, however, because Plaintiff's testimony as to the scope of the policy should be disregarded specifically because it contradicts his earlier deposition testimony without adequate explanation.

Plaintiff's deposition, he admitted attending training on Defendant's sexual harassment policy, but testified that he did not recall when he went to training or even if he attended more than one sexual harassment training.  (Dep. of Paul Ossman [Docs. 62-7 to 62-11] ("Pl. Dep.") at 66-67.)   When asked if he remembered any details from the training, he stated "I don't remember."  (*Id.* at 68.)  And when presented with documents to refresh his memory about having attended sexual harassment training, Plaintiff testified that he still could not recall any of the contents of the training.  (*Id.* at 69.)

Despite this clear and unequivocal testimony that he could not remember any of the substance of his training, Plaintiff has now presented declaration testimony stating:

> We were told during harassment training by the session leader that the defendant's Discrimination and Harassment Policy—including the language that a violation could result in disciplinary action up to and including discharge from employment or termination of contract—only covered workplace behavior.

(Decl. of Paul Ossman [Doc. 71-3] ("Pl. Decl.") ¶ 14.)  Plaintiff's declaration states further that the trainer affirmatively disclaimed that the Discrimination and Harassment Policy was limited to guarding against statutorily protected classifications, but "applied to all types of workplace harassment of co-workers,"

8

including any "abusive or inappropriate behavior having nothing to do with sex, race, color, or any other legally protected basis."  (*Id.* ¶¶ 12-13, 15-16.)

This unexplained about-face is insufficient to create a genuine issue of fact as to the scope of Defendant's anti-harassment rules.  "Under the sham affidavit rule, '[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"  *In re Stand 'N Seal, Prods. Liab. Litig.*, 636 F. Supp. 2d 1333, 1335 (N.D. Ga. 2009) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  Plaintiff's declaration testimony—recalling specific, esoteric aspects of a sexual harassment training that purportedly immunized out-of-office sexual harassment and applied the Policy to practically anything that could be considered bullying—clearly contradicts his deposition testimony disclaiming any memories of the training.  It is a blatant attempt to improve his case by, on the one hand, expanding the definition of workplace misconduct to include every type of rude or unprofessional conduct (so that he can identify other "comparators" who "should have been" disciplined under the Policy), while on the other hand minimizing the significance

of the out-of-office overtures he directed at female coworkers (to argue that he should not have been disciplined in the first place).

Plaintiff justifies this change in testimony by stating that after his deposition, he reviewed "287 pages of materials" that Defendant had produced in discovery, which "refreshed [his] memory about a number of events, conversations, and topics—including what the defendant's harassment training covered when I attended in early 2018." (Pl. Decl. ¶ 11.) Of course "no one's memory is perfect," but material changes to deposition testimony are improper, and should be disregarded absent an adequate explanation. *Norelus v. Denny's Inc.*, 628 F. 3d 1270, 1281 (11th Cir. 2010) (finding improper the submission of a sixty-three page errata sheet); *see also Reynolds v. Int'l Bus. Mach. Corp.*, 320 F. Supp. 2d 1290, 1300 (M.D. Fla.), *aff'd*, 125 F. App'x 982 (11th Cir. 2004) (Federal Rule of Civil Procedure 30(e) "cannot be interpreted to allow one to alter what was said under oath . . . unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not'"). Thus, while courts should apply the sham affidavit rule "sparingly" and distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence," explanations for such discrepancies must be

"plausible" in order to avoid exclusion under the sham affidavit rule. *Santhuff v. Seitz*, 385 F. App'x 939, 944 (11th Cir. 2010) (citing *Tippens v. Celotex Corp.*, 805 F.2d 949, 955 (11th Cir. 1986)).

Here, Plaintiff repeatedly disclaimed any memory about the substance of his sexual harassment training, despite reviewing documents during the course of his deposition, and has not identified any particular document that refreshed his memory about these very unusual aspects of the training he purportedly underwent years early. If there were a document that somehow suggested or insinuated that all rude behavior came under the purview of the Discrimination and Harassment Policy, or that sexual harassment outside of the office was fine under Defendant's policies, or if Plaintiff even identified how his memory was refreshed by any particular document, the calculus might be different. But Plaintiff has changed his testimony in order to declare that Defendant's policies were, in fact, extremely lenient to sexual harassers and has simply pointed to undifferentiated "materials" when required to explain the change. Between his clear deposition testimony and his exceedingly weak explanation, this is one of those rare cases in which the sham affidavit rule applies, because no reasonable juror could accept Plaintiff's declaration testimony on the point. *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th

11

Cir. 2012) ("[N]o juror would believe Yeager's weak explanation for his sudden ability to remember the answers to important questions about the critical issues of his lawsuit.  It is implausible that Yeager could refresh his recollection so thoroughly by reviewing several documents in light of the extreme number of questions to which Yeager answered he could not recall during his deposition."); *see also Wessels v. Moore Excavation, Inc.*, No. 3:14-CV-01329-HZ, 2016 WL 1589894, at *9 (D. Or. Apr. 18, 2016) (disregarding declaration testimony about specific negative statement supervisor made because declarant testified three times at his deposition that he could not recall any negative statements).

*Bryant v. U.S. Steel Corp.*, 428 F. App'x 895 (11th Cir. 2011), cited by Plaintiff, actually supports the conclusion that Plaintiff's declaration is a sham.  In *Bryant*, the Eleventh Circuit affirmed the trial court's decision to disregard an affidavit in which the plaintiff "remembered the exact date on which she received the right-to-sue letter, flatly contradicted her earlier deposition testimony, in which she stated that she did not remember the date," because the only explanation that plaintiff offered was her counsel's affirmation that "her recollection had been refreshed," which was not admissible evidence.  *Id.* at 897.  Although Plaintiff has offered "evidence" that his recollection was refreshed in this case, his testimony on

the point is entirely conclusory and fails to plausibly explain how his memory was refreshed in way the Court can evaluate.  As such, it amounts to virtually no explanation at all, and the undersigned sees little meaningful difference between Plaintiff's offering in this case, and the offering in *Bryant*.  *See also Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (evaluating an affidavit at summary judgment) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.") (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (quotation marks omitted)); *cf. Cortes v. Broward Cnty.*, 758 F. App'x 759, 762 (11th Cir. 2018) (observing without criticism that trial court allowed affidavit based upon refreshed recollection when memories about law enforcement's use of excessive force were refreshed specifically on the review of "surveillance video recordings" and the officers' video depositions).

In sum, Plaintiff's revisionist declaration testimony that he now recalls the details of what was told to him during harassment training should be disregarded as sham testimony.  As a result, Plaintiff may not rely on that testimony to create an issue of fact as to the scope of Defendant's Discrimination and Harassment Policy.

13

The Court now turns to the facts of the case.

## C.   Factual Background

### 1.   Defendant and Plaintiff's Employment

Defendant is a publicly held media and marketing services company comprised of national and local media groups.  (DSMF ¶ 1.)  CBS46, a news station in Atlanta, Georgia, is part of Defendant's local media group.  (DSMF ¶ 2.)

Plaintiff is a white man.  (PSAF ¶ 1.)  He was hired by Defendant on January 19, 2012, as a temporary weekend meteorologist.  (DSMF ¶ 7.)  During the time period relevant to this action, Steve Doerr worked for Defendant as the News Director for CBS46.  (DASMF ¶ 1.)  On August 1, 2017, Plaintiff was promoted to the role of chief meteorologist.  (DSMF ¶ 9.)  Apparently as part of the promotion, Plaintiff signed an employment agreement with Defendant (the "Agreement") for a four-year term ending in August 2021.  (DSMF ¶ 11; *see also* Agreement [Doc. 62-6].)  It contained a clause permitting the early termination of the Agreement "for cause," which it defines as any action by the employee that constitutes misconduct, as well as the "violation of the Meredith Code of Business Conduct and Ethics or Company policy."  (DSMF ¶¶ 13-14.)  Determining whether "cause" exists under the Agreement is determined "at the discretion of the Employer."  (DSMF ¶ 17.)

14

Along these lines, Defendant maintains multiple policies prohibiting unlawful discrimination and harassment. (DSMF ¶ 3.) Its Discrimination and Harassment Policy states that all employees are responsible for reporting violations, and provides six separate methods of reporting workplace discrimination or harassment, including: an employee's manager, that manager's supervisor, or a human resources representative. (DSMF ¶¶ 4, 5[3].) It also provides that any violation is grounds for disciplinary action up to and including discharge from employment or contract termination. (DSMF ¶ 6.)

Plaintiff received a copy of the employee handbook containing Defendant's policies when he was hired; received anti-harassment training; and was aware of Defendant's policy against sexual harassment in the workplace. (DSMF ¶¶ 15, 16.) Indeed, he specifically admitted that "that inappropriate jokes, blurbs, hostile acts or frank negative stereotyping and/or threats were a violation of company policy," and he knew that he could be terminated for engaging in such acts in the workplace. (Pl. Dep. at 73.)

---

[3] In response to DSMF ¶¶ 4 and 5, Plaintiff provides no substantive basis to disregard Defendant's statement of fact. (*See* R-DSMF ¶¶ 4, 5.) Because the undersigned finds them material, Plaintiff's objections are overruled.

## 2.     Complaints About Plaintiff's Conduct

In April 2017, a female meteorologist ("Complainant 1")[4] reported that Plaintiff made sexually inappropriate comments to her and in front of her.  (Decl. of Laurel Berenguer [Doc. 62-4] ¶ 15.)   After the issue was escalated, Human Resources Director Laurel Berenguer requested that Complainant 1 meet with her to discuss her problems with Plaintiff and determine whether there were issues to resolve.  [*See* Doc. 62-16 (meeting notes).]   (*See also* Berenguer Decl. ¶¶ 40-41 (authenticating notes and other materials from her investigations into Plaintiff's conduct).)   Complainant 1 explained that Plaintiff had said repeatedly he was "cockblocked" during a dispute about vacation scheduling; that he had told Complainant 1 that he had a dream about them having sex; and that he told an African American employee that his first "three-way" was with a black woman. (Berenguer Decl. ¶ 15; DSMF ¶ 24; PSAF ¶ 4.)  [*See also* Doc. 62-16.]

In May, Plaintiff met with Berenguer and Frank Volpicella, Plaintiff's supervisor at the time, to discuss his interactions with Complainant 1.  (DSMF ¶ 25; R-DSMF ¶ 25; *see also* Pl. Dep. at 83-84.)  [*See also* Doc. 16-12 (May 2017

---

[4] For the reasons explained in its April 30, 2021 Order, the Court will refer to the female complainants in this case by aliases.  [*See* Doc. 65.]

written warning).]  Plaintiff admitted using the term "cockblocked," but denied the remaining allegations against him.  (DSMF ¶ 26.)  [Doc. 62-12.]  Plaintiff was reminded that Defendant had "zero tolerance for behavior that could contribute to a hostile work environment," and that his comments during the meeting raised concerns about retaliation.  [Doc. 62-12.]  Plaintiff was issued a written warning, advising him that "further incidents may result in additional disciplinary action, up to and including termination."  [*Id.*]  Plaintiff signed this first written warning on May 15, 2017, acknowledging that he had reviewed it and received a copy.  (DSMF ¶ 28; PSAF ¶ 24.)

In November 2017, a female news producer ("Complainant 2") reported to Berenguer that Plaintiff had sent her highly inappropriate messages on Facebook— he allegedly told her that he masturbated while thinking about her, that he wanted to have sex with her, and that he wanted her to send him pictures of her—and that she was concerned about retaliation if she did not reciprocate.  (Berenguer Decl. ¶ 18; DSMF ¶¶ 30-32.)  On November 17, Plaintiff met with Berenguer and Doerr to discuss the allegations by Complainant 2 that Plaintiff had again engaged in sexually inappropriate behavior.  (DSMF ¶ 33; DASMF ¶ 3; PSAF ¶ 11; R-PSAF

¶ 11.)  Plaintiff admitted to sending the messages,[5] explained that he had been attempting to enter into an "off-duty relationship" with Complainant 2,[6] and apologized for making Complainant 2 uncomfortable.  (DSMF ¶ 34.)

Following the meeting, Doerr prepared a written warning memorializing the incident, highlighting that Plaintiff's conduct violated Defendant's "zero tolerance for behavior that could contribute to creating a hostile work environment," and indicating that "[f]urther incidents may result in additional disciplinary action, up to and including termination."  (Berenguer Decl. ¶¶ 21-22.)  [Doc. 62-13 (Dec.

---

[5] Plaintiff's declaration states that the messages were "initiated" by Complainant 2, were "mutual," and "did not occur in the workplace."  (Pl. Decl. ¶ 22.)  Plaintiff does not explain what he means by any of this—for instance, what the complainant did to "initiate" the Facebook conversation, whether she ever sent sexually explicit messages to Plaintiff (or indeed, what the contents were of any of her messages), or when and where Plaintiff was (and whether the device he used was provided by Defendant) when he sent or received the messages.  (*Cf.* Pl. Dep. at 87 (asked why he though the conversation was "mutual," Plaintiff testified only that "she started it").)  Plaintiff also points to no evidence that he explained any of this to Berenguer or Doerr; indeed, at his deposition, he only acknowledged that he apologized to them for his behavior.  (*See* Pl. Dep. at 87; *see also id.* at 86, 88 (asked about discussing event with Doerr and Berenguer on Nov. 17, 2017) ("I don't recall a lot of this.").)  Between the equivocal nature of the testimony and the fact that there is no evidence to suggest that Plaintiff's statements about his interactions with Complainant 2 were every expressed to decisionmakers in this case, the Court does not find them material to resolution of the issues in this case.

[6] Defendant does not have a policy prohibiting employees from entering into off-duty personal relationships with coworkers.  (R-PSAF ¶ 12.)

2017 written warning).]  The parties dispute whether the written warning was actually provided to Plaintiff during his employment (*see* Pl. Dep. at 85, 87-88; Decl. of Steve Doerr [Doc. 74-3] ¶ 5).[7]  Regardless, Plaintiff testified that following

_____

[7] Plaintiff could not recall much about the second disciplinary meeting during his deposition.  (Pl. Dep. at 85-89.)  He testified that he could not remember whether he was advised that his interactions with Complainant 2 were a violation of Defendant's policies (or even that they were making her uncomfortable), that he could be disciplined or fired for further incidents, or even that it was a final warning.  (*Id.*)  Contrary to that testimony, and more directly contrary to Berenguer and Doerr's testimony and the notes from the meeting, his declaration now states that he can affirmatively recall that Doerr stated that Plaintiff would not receive any warning for the conduct and, in fact, that Plaintiff did not violate any of Defendant's policies.  (Pl. Decl. ¶¶ 11, 22-25.)  Defendant has objected to consideration of these statement as a sham.  (R-PSAF ¶¶ 10, 13-15.)  Plaintiff has not specifically defended this declaration statement, but his counsel has argued that Plaintiff generally refreshed his memory about his disciplinary meetings by reviewing the notes from the meetings.  [*See* Doc. 77-1 at 18-21.]

Beyond the fact that Plaintiff has not offered actual evidence (as opposed to his counsel's argument) about refreshing his memory other than his generic statement that he refreshed it by reviewing "materials," the meeting notes that his counsel now suggests refreshed his memory contain nothing that supports Plaintiff's newly refreshed recollection.  They consist of a half-page of handwritten notes alternatively describing Plaintiff's conduct as "too friendly," indicating that Defendant was "deeply concerned," and stating that Plaintiff would be "under scrutiny."  [Doc. 62-17 at 4.]  Because Plaintiff does not provide a plausible explanation for his new recollection that he was told he did not violate any policies and would not be disciplined, the declaration statements will be disregarded. *Santhuff*, 385 F. App'x at 944 (holding that "implausible" and "inadequate" explanations will not save sham affidavits).

19

the meeting, he did not "have any questions about CBS 46's or [Defendant]'s discipline procedure." (Pl. Dep. at 88.)

In April 2019, Doerr became aware that another female employee ("Complainant 3") had complained that Plaintiff had made inappropriate and sexually harassing comments to her. (DSMF ¶ 39; DASMF ¶ 6.) Specifically, Complainant 3 alleged that Plaintiff said "not to be like uncle Joe [Biden],[8] I wanted to let you know I look at you all the time. You're so pretty, put together. I see you walk around and you carry yourself very well. You're very attractive and that's attractive to me . . . You always look nice." (DSMF ¶ 40.) The same day, Berenguer and Doerr met again with Plaintiff to discuss the allegations. (DSMF ¶ 41.) According to Plaintiff, he meant his comments as praise, characterizing them as "complimenting an employee, telling her she was a doing a great job." (Pl. Dep. at 125-126; *see also* Pl. Decl. ¶¶ 27-28.) Along these lines, Plaintiff testified that

---

[8] The Court takes judicial notice that in April 2019, then-presidential nominee Joe Biden was making headlines in relation to sexual assault allegations by a former Senate aide. *See* The New York Times, "Examining Tara Reade's Sexual Assault Allegation Against Joe Biden," located at https://www.nytimes.com /2020/04/12/us/politics/joe-biden-tara-reade-sexual-assault-complaint.html   (last visited Jan. 5, 2022). Later that year, those allegations were discredited. *See* The Washington Post, "New reporting puts focus on Tara Reade's inconsistencies," located at https://www.washingtonpost.com/politics/2020/05/23/ reporting-tara-reade-credibility/ (last visited Jan. 5, 2022).

he had seen a "big change" between different generations about what is inappropriate, but still thought that telling a woman "she looks good" should only be viewed as a compliment. (Pl. Dep. at 176-78.)[9]  Doerr reminded Plaintiff that

_____

[9] At his deposition, Plaintiff could not recall what Berenguer and Doerr said beyond explaining that Complainant 3 "thought [he] made inappropriate comments." (Pl. Dep. at 124-25.)  In his declaration, however, Plaintiff now affirmatively asserts—in order to challenge Berenguer's testimony and the meeting notes on the point—that he recalled being asked if he told the complainant six different sexually suggestive statements and that he also "specifically *denied*" making any of them.  (*See* Pl. Decl. ¶¶ 27-28; *cf.* Berenguer Decl. ¶¶ 27-28 (testifying that Plaintiff admitted to making these statements).)  [*See also* Doc. 62-18 (meeting notes indicating Plaintiff admitted to many of the statements).]  Defendant has objected to consideration of these statement as a sham.  (R-PSAF ¶ 11, 19.)

As with Plaintiff's declaration testimony about the November 2017 disciplinary meeting, his counsel contends that Plaintiff refreshed his memory about the April 2019 disciplinary meeting by reviewing the notes from the meeting.  [*See* Doc. 77-1 at 18-21.]  But again, beyond the fact that Plaintiff has not offered actual evidence (as opposed to his counsel's argument) about refreshing his memory other the generic statement that he refreshed it by reviewing "materials," the meeting notes contain nothing that supports Plaintiff's newly refreshed recollection.  They consist of a two pages of typed notes, and include various statements Plaintiff purportedly made, along with, "Paul said who and then he said, do you mean [Complainant 3]?  He proceeded to repeat pretty much word for word what [Complainant 3] told us. . . . He acknowledged both and said he didn't mean anything by his comments."  [Doc. 61-18.]  Because the notes from the meeting specifically recount Plaintiff acknowledging the statements in question, the undersigned finds Plaintiff's explanation either implausible (because the declaration testimony contradicts his own deposition testimony ***and*** the notes from the meeting) or inadequate (in that his explanation does not attempt to resolve any of these conflicts).  As such, it will be disregarded.  *Santhuff*, 385 F. App'x at 944.

21

this was not the first time Plaintiff had been disciplined about making comments to female employees (DSMF ¶ 44; R-DSMF ¶ 44),[10] and provided Plaintiff with copies of at least Plaintiff's first written warning (DSMF ¶ 46; R-DSMF ¶ 46).[11] Doerr further explained that Plaintiff, as Chief Meteorologist, needed to be aware of the power dynamic between himself and an employee such as a producer. (DSMF ¶ 45.) Doerr told Plaintiff that he was being suspended pending a decision on how the station would handle the situation. (DSMF ¶ 47.)

### 3. Plaintiff's Discharge

After their meeting, Doerr met with Station General Manager, Lyle Banks. (DASMF ¶ 7.) Doerr and Banks—the "primary decisionmakers" in this case— made the decision to terminate Plaintiff's employment due to his pattern of policy violations, and "decided to request authorization" from the corporate office to

---

[10] Plaintiff disputes DSMF ¶ 44 only to the extent it suggests that Doerr reminded Plaintiff about the December 2017 written warning, which he contends he did not receive. (*See* DSMF ¶ 44.) Plaintiff does not dispute that Doerr reminded him about the prior incidents or that he had in fact been disciplined for prior comments to female employees. As such, the statement of fact is deemed admitted.

[11] The parties dispute whether a copy of the final written warning was provided as well. (*Compare* Berenguer Decl. ¶ 29, *with* Pl. Decl. ¶¶ 25, 30-31.) [*Cf.* Doc. 62-18 (meeting notes indicating that both written warnings were produced to Plaintiff during the meeting).]

proceed with Plaintiff's firing.  (Berenguer Decl. ¶ 32; Dep. of Laurel Berenguer Vol. I [Doc. 62-14] ("Berenguer Dep. I") at 73-74.)  Doerr asserts that Plaintiff's discharge was necessary to "maintain a safe workplace free from sexual harassment."  (Doerr Decl. ¶ 10.)

At that point, Banks requested that Berenguer prepare a recommendation to submit to the corporate office for approval to proceed with the termination.[12]  (*See* Defs. Supp. Interrog. Resps. [Doc. 62-21] No. 5; *see also* Berenguer Dep. I at 74.) Berenguer completed a form (the "Form") in connection with this process, which she described as a "template used to review or request a discharge."[13]  (Berenguer Dep. I at 12, 36, 178-79; *see also* Docs. 62-20, 71-4 (two iterations of the Form[14]

---

[12] Berenguer testified that, in general, when incidents occurred warranting discipline an employee's immediate supervisor and that person's supervisor would discuss the incident to "determine whether it was appropriate to request authorization to discharge," and that she would then submit the formal paperwork "when we are requesting approval to carry out an activity or an employee action." (Berenguer Dep. I at 74-75, 179.)

[13] Berenguer explained that the Form was required for restructurings, reorganizations, and discharges, and that she had been preparing them throughout her 14-year employment with Defendant.  (Berenguer Dep. I at 73, 179.)

[14] Berenguer updated the form with an additional comparator shortly after Plaintiff's discharge (*see* R-PSAF ¶ 39); that updated version was originally provided to Defendant in discovery before the original version was produced (Decl. of Jack Rosenberg ¶ 3).  [*See also* Docs. 62-20 and 71-4 (forms for Plaintiff).]  The Court will rely on the original version.

for Plaintiff); Berenguer Dep. I at 42 (authenticating the same).)  To complete it, the Form instructed that a business rationale or justification for the discharge be provided, along with disciplinary and performance materials for the employee, other data concerning revenue and market data relevant to the employee, and relevant background information about employees in the same business unit.  [Doc. 71-4.]  (*See also* Berenguer Dep. I at 60-61.)[15]  It also asked that an attached "EEO Analysis" and "EEO Stats Report" be completed, which would provide demographic statistics about the impacted business unit and other employees with "comparable" positions or disciplinary issues.  [Doc. 71-4 at 1.]

Berenguer explained that these EEO portions of the form were completed to ensure that Defendant was "being equitable" when discharging employees, including with regard to race; the comparable employees on Plaintiff's Form, for instance, were individuals who worked in the "same or similar capacity as [Plaintiff]."  (Berenguer Dep. I at 43, 51-53.)[16]  While the template contained

---

[15] Berenguer testified that she had also been trained on completing the Form by Defendant's corporate head of HR.  (Berenguer Dep. I at 72.)

[16] With more than 25 citations, Plaintiff contends that every time Defendant discharged someone over the last 14 years, Defendant used the EEO Analysis to "compar[e] the[] racial mix after the proposed firing" and that that those racial comparisons were the sole reason any discharge was approved—"irrespective of any rationale given by the requesting managers."  (PSAF ¶¶ 29, 30.)  As noted,

instructions for completing it, Berenguer could not recall a specific policy on how to complete the Form, explaining that she had been trained to use it when she was hired and that it had always been her general practice to complete it.  (Berenguer Dep. I at 53, 72.)

In any event, Berenguer completed the Form and sent it along to Kandis Bock, a corporate vice-president of Human Resources and Berenguer's supervisor, and Joshua Pila, an in-house attorney with Defendant.  (Berenguer Dep. I at 21.) The Form listed Doerr and Banks as the "decision makers for this action," explained that the business rationale for discharging Plaintiff was "policy violations and sexual harassment/hostile environment," and listed out Plaintiff's previous disciplinary problems.  [Doc. 71-4 at 2 (cleaned up).]  It also included a summary of the demographics of CBS46's news department along racial, gender, and age lines; listed other employees who had been disciplined for poor judgment

_____

there is evidence to support that the Form has been used, as a general matter, for discharges throughout Berenguer's tenure with Defendant (*see* Berenguer Dep. I at 54-55); however, the Court has examined each of the citations Plaintiff supplies, and none indicates that every discharge was accompanied by an EEO Analysis, much less that no discharge could take place without a "before and after" racial comparison or that the business rationale supplied for terminations are regularly disregarded in authorizing firings.  Thus, Plaintiff's statement of fact does indeed appear to be speculative, and will not be considered.  (*See* R-PSAF ¶¶ 29, 30.)

or sexual harassment (two had been discharged, and the other had been disciplined with no further incidents); and listed comparable employees in similar positions to Plaintiff (none had similar disciplinary issues),[17] along with demographic and employment information (all were reporters or weather reporters).  [*Id.* at 3-4.] There is no evidence about if or how Bock or Pila actually used any of the information sent by Berenguer.[18]

_____

[17] Defendant did not include these specific comparables in its initial disclosures or in the joint preliminary report and discovery plan in this case.  (PSAF ¶ 49.)

[18] With at least seven different citations, Plaintiff asserts that the "final decisionmaker for Plaintiff's firing was ***Kandis Bock***."  (PSAF ¶ 28; *see also* PSAF ¶ 38.)  As Defendant correctly points out, however, none of those citations supports the assertion.  (*See* R-PASF ¶¶ 28, 38.)  Plaintiff also goes on to use most of those same citations to assert that "Bock was required to consider Plaintiff's race, gender, and age compared" to Plaintiff's coworkers "to determine whether to approve Plaintiff's firing."  (PSAF ¶ 32; *see also* PSAF ¶¶ 33-36, 38.)  This too is without support, and will not be considered.  Plaintiff then goes on to make several statements about what Bock did or did not do in deciding whether to authorize Plaintiff's discharge.  (*See* PSAF ¶¶ 39-43.)  His citations, however, do not describe any of Bock's conduct; instead, they are the same list of citations Plaintiff provides in his failed attempt to characterize the EEO Analysis as a racist rubric for making employment decisions.  They therefore do not support his statements, which will be disregarded in the present analysis.

The parties do agree, however, that Pila did not make the decision to terminate Plaintiff's employment.  (PSAF ¶ 45; R-PSAF ¶ 45.)

The corporate office then provided authorization to discharge Plaintiff (Berenguer Dep. I at 173), and on April 8, 2019, Doerr informed Plaintiff that he was being discharged (DSMF ¶ 48).

After Plaintiff was fired, the chief meteorologist position was filled by Jennifer Valdez, who had been employed by Defendant since 2012. (DSMF ¶ 101.) Plaintiff testified that he did not believe she was selected to replace him because she was a woman of color or that she was unqualified for the position. (Pl. Dep. at 93-94.)

Further discussion of background facts and evidence will be included as necessary to the analysis below.

## III.   DISCUSSION

In evaluating Plaintiff's claims, the Court addresses his abandoned claims first, takes up his Title VII discrimination claim next, and evaluates his state law claim last.

### A.   Abandoned Claims

In his amended complaint, Plaintiff raises claims for hostile work environment discrimination, disparate treatment discrimination, and wrongful termination under 42 U.S.C. § 1981, as well as state law claims for breach of

27

contract.  [*See* Doc. 11 ¶¶ 12-34.]  Despite raising these claims and seeking and obtaining an extended stay of discovery to develop further claims under Title VII of the Civil Rights Act of 1964, 28 U.S.C. § 2000*e* ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") [*see* Doc. 22], Plaintiff has filed a notice "abandoning" his hostile work environment claims under Section 1981, as well as his claims under Title VII and the ADEA [Doc. 70]. Additionally, in response to Defendant's motion for summary judgment, which argues that summary judgment should be granted on those abandoned claims, Plaintiff has lodged no opposition or otherwise suggested that summary judgment would not be appropriate.  [*See* Doc. 71.]  As a result, summary judgment should in fact be granted as to any claim Plaintiff has asserted for hostile work environment discrimination, or might have asserted pursuant to Title VII or the ADEA.  *See, e.g., Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district

court is sufficient to find the issue has been abandoned).  Thus, the only substantive claims at issue in this case are Plaintiff's claims for disparate treatment discrimination and discriminatory discharge under Section 1981 and breach of contract under Georgia common law, which the Court now addresses.

### B.    Race Discrimination

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (citations omitted).  Thus, to prevail on a Section 1981 claim, a plaintiff must prove that the defendant acted with discriminatory intent.  *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989).  Plaintiff here alleges that Defendant discriminated against him, first, when it disciplined him and, second, when it terminated his employment. [*See* Doc. 11; *see also* Doc. 70 at 18-20, 29-32.]

The methods for establishing employment discrimination are the same under Section 1981 as they are under Title VII, *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 n.6 (11th Cir. 2015), and, thus, a plaintiff may prove intentional discrimination through (1) direct evidence; (2) pattern and practice evidence, or (3) circumstantial evidence of discrimination, *see Kilpatrick v. Tyson Foods, Inc.*, 268

F. App'x 860, 861 (11th Cir. 2008); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).  In this case, Plaintiff argues he had both direct and circumstantial evidence of discrimination, which the undersigned takes up in turn below.

### 1.      Direct Evidence

Plaintiff's initial argument—that he has presented direct evidence of discrimination by virtue of Defendant's use of the Form during the process of firing him—fails.   Direct evidence of discrimination is evidence that reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  *Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999).  In other words, the evidence must indicate that the complained-of employment decision was motivated directly by the decisionmaker's unlawful animus "without inference or presumption." *Kilpatrick*, 268 F. App'x at 861-62; *see also Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002).  As a result, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination.  *Scott*, 295 F.3d at 1227; *see also Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990).  In this case, a clear example of "direct

evidence would be a management memorandum saying, 'Fire [Ossman]—he is [white].'" *Earley*, 907 F.2d at 1082; *see also Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996) ("A quintessential example of direct evidence in a retaliation case is:  'Fire [Plaintiff] – he gave the most damning deposition testimony. . . .'") (quoting *Earley*, 907 F.2d at 1801).  Importantly, remarks unrelated to the decision-making process itself—including statements by nondecisionmakers—are not direct evidence of discrimination.  *Scott*, 295 F.3d at 1228; *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty.*, 256 F.3d 1095, 1105 (11th Cir. 2001).

Despite this exacting standard, Plaintiff points to the EEO Analysis contained on the Form that Berenguer completed and sent to Bock and Pila, and argues, largely by assertion, that it constitutes direct evidence of discrimination as an "invalid," "informal affirmative action program." [Doc. 71 at 14-17 (citing *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1112 (11th Cir. 2001); *Lehman v. Yellow Freight Sys., Inc.*, 651 F.2d 520, 526 (7th Cir. 1981); *Hamilton v. Gen. Motors Corp.*, 606 F.2d 576, 581 (5th Cir. 1979).]  Plaintiff, however, provides virtually no legal or factual support for his position that Defendant's use

31

of the EEO Analysis when firing employees constitutes either an affirmative action plan (much less an invalid one) or direct evidence of discrimination.

Starting from the legal standpoint, while it may be true that evidence that establishes the use of an invalid affirmative action plan can amount to direct evidence of discrimination, nothing from Plaintiff's cited authority suggests it occurred here.  In *Hamilton*, for instance, a short opinion issued over 40 years ago, a black electrician filed a Title VII discrimination lawsuit against his employer for, *inter alia*, refusing to hire him initially and then delaying a hiring decision years later, all while "others, all white, were more quickly hired."  *Hamilton*, 606 F.2d at 578-79.  Without actually delving into any details about the facts underlying the case, the former Fifth Circuit panel remarked in passing that they were simply "convinced from the record that defendant's higher level management wanted to hire blacks in skilled trades, an obvious informal affirmative action pursuit," and affirmed the trial court's decision to grant summary judgment in favor of the employer, explaining that they "choose not to dampen the enthusiasm of employers" who seek to implement such affirmative action programs.  *Id.* at 581.  In other words, the panel seemed to approve of the affirmative action plan and used it as evidence that the employer ***did not*** discriminate against the plaintiff.

Regardless, a no point did it explain what constitutes an affirmative action program, much less when such a program would be prohibited by Title VII or § 1981 or constitute direct evidence of discrimination.

Next, in *Lehman*, the Seventh Circuit disapproved of an "ad hoc" plan under which the defendant admittedly gave applicants preference based upon race. *See* 651 F.2d at 525 (hiring manager admitted that race was a "plus factor" for certain applicants, that "the color of his skin might be in his favor," and that his race was "probably in his favor").  The Seventh Circuit found that, in combination with testimony about achieving certain racial or demographic "attainment levels," this approach amounted to an informal affirmative action plan, but one that was not justified by "any idea or goal for which minority hiring should reach nor any idea of when such a level was reached." *Id.* at 528.  So while *Lehman* spoke to concerns about the validity of informal affirmative action plans, there has been no such admission by Defendant in this case that race was a regular factor in making any type of employment decision; and as will be discussed below, Plaintiff has not set forth any non-speculative evidence that racial preferences had any role in the decision to fire him.  As a result, it is inapplicable to the present analysis.

Finally, in *Bass*, a "reverse discrimination" case, the Eleventh Circuit actually addressed the issues Plaintiff raises.  It explained that "[i]f it is either proven or conceded that a defendant acted pursuant to an affirmative action plan," the utilization of such a plan can be direct evidence of discrimination for summary judgment purposes if the plan is invalid.[19]  *Bass*, 256 F.3d at 1113-15 (citing *In re Birmingham Reverse Discrimination Emp. Litig.*, 20 F.3d 1525, 1537 (11th Cir. 1994) ("[I]n addition to shouldering the burden of proving that the County acted pursuant to its affirmative action plans, Bass also must show that the County's affirmative action plans were invalid in order to hold the County liable under Title VII for acting pursuant to those plans.")).  Importantly, it also made clear that for an affirmative action plan to amount to direct evidence of discrimination, the plaintiff has the burden of demonstrating both that the plan was "invalid" and that "the plan was followed in [the challenged] employment decision." *Id.* at 1110; *see also id.* at 1113-14 ("In *Johnson*, the Supreme Court held that the burden of showing that an affirmative action plan is invalid is on the plaintiff.") (citing

---

[19] Additionally, while the defendant's chief purportedly stated that the defendant "will continue to promote on the basis of color," the Eleventh Circuit still held that his statements "do not constitute direct evidence of discrimination," because he was not on the interview panel and there was "no evidence showing that [the chief] was a decisionmaker." *Bass*, 256 F.3d at 1105.

*Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 26-27 (1987)).  To show invalidity, then, the Circuit set forth the following test:

> We must first determine whether the employer's consideration of the race of promotional candidates was justified by a manifest racial imbalance that reflected under-representation of the affirmative action plan's beneficiaries in traditionally segregated job categories.  If such a justification was present when the plan was developed, we must then determine whether the plan itself provides a proper remedy for that imbalance.  A remedy is proper if the plan does not unnecessarily trammel the rights of non-black employees or create an absolute bar to their advancement.

*Id.* (quoting *In re Birmingham Reverse Discrimination Emp. Litig.*, 20 F.3d at 1537) (cleaned up)).  Thus, the burden in this case is on Plaintiff to set forth facts and argument to establish that his firing resulted from an affirmative action plan and that the plan is invalid.

Plaintiff's argument that Defendant actually utilized an invalid affirmative action plan, however, is completely underdeveloped.  Moreover, he fails to point to evidence tending to show (1) that Bock was a decisionmaker, much less that the final decisionmaker, in this case; (2) that Bock or anyone else actually reviewed and utilized the racial-demographic information in the EEO Analysis portion of the Form when authorizing Doerr and Banks's request to discharge Plaintiff; or (3) how any review of information the demographic information (which, it is

35

undisputed, did not change Doerr and Banks's recommendation) amounts to an affirmative action plan giving preference to any particular race.  Without that evidence, Plaintiff cannot to show that Defendant's use of the EEO Analysis in this case amounts to the utilization of an affirmative action plan, let alone an invalid plan.  *See Johnson*, 480 U.S. at 626 ("That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan.  The burden of proving its invalidity remains on the plaintiff.").

The paucity of Plaintiff's evidence is easily identified when looking at his citations on the point.  For instance, for Bock being "the final decisionmaker" in this case, Plaintiff points to:

- Berenguer's testimony that Doerr and Banks "made the request to have authorization to discharge" Plaintiff, (Berenguer Dep. I at 74);

- an interrogatory response that states, "After the third instance of inappropriate behavior [by Plaintiff], Mr. Lyle Banks reviewed the facts and requested that Ms. Berenguer put together a recommendation to submit to corporate for approval to proceed with termination," [Doc. 62-21 at Interrog. Resp. No. 5];

36

- Berenguer's testimony that she sent the Form to Bock and Pila (Berenguer Dep. I at 11);

- Berenguer's testimony that Bock was Vice President of Human Resources (*id.* at 21);

- Berenguer's testimony that in response to the request, "corporate" would have sent "authorization to proceed with the discharge" (*id.* at 174)

- Berenguer's testimony that she did not know if any specific policy pertained to completing the Form, but that she had been trained on using it, had used it throughout her tenure with Defendant, and did not believe the Form was improperly used by Defendant (*id.* at 21); and

- a corporate organizational chart showing Berenguer reporting to Bock [Doc. 71-5].

[*See* Doc. 71 at 6-7.]  Even taking all reasonable inferences in Plaintiff's favor, this evidence merely shows that Doerr and Banks needed corporate signoff to fire Plaintiff.  But that was already undisputed.  Additional undisputed evidence also shows that Doerr and Banks, as "primary decisionmakers," initiated the recommendation that Plaintiff be discharged and provided the business rationale

for his termination before any demographic information was collected, and actually carried out Plaintiff's firing after the corporate office approved their recommendation.  There is nothing, however, to suggest Bock could have initiated any employment action on her own, or, indeed, that she did anything other than rubberstamp Doerr and Bank's recommendation.  "Where the [manager] with formal decisionmaking authority merely rubberstamps the recommendation of others, the employer . . . has actually delegated the decisionmaking responsibility to those whose recommendation is rubberstamped."  *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1195 (2011) (Alito, J., joined by Thomas, J., concurring).

In other words, even taking the reasonable inferences in Plaintiff's favor, the evidence still only establishes that Bock approved the decision by Doerr and Banks to fire Plaintiff, which was based upon the justifications set forth in the Form. Plaintiff's suggestion that Bock could do (or in fact did do) anything more than rubberstamp their decision is mere speculation without basis in the record evidence, and will not create a material issue at summary judgment. *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)) ("Conclusory allegations and speculation are insufficient to create a genuine issue of material fact."); *see also Cordoba*, 419 F.3d

at 1181 ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

The evidence Plaintiff offers to demonstrate that the use of the Form amounts to an invalid affirmative action plan is even less persuasive. Plaintiff argues that Defendant's management "approve or deny requested firings—including plaintiff's—by considering the race of the subject employee and his coworker-comparables," and that Bock actually "considered plaintiff's race compared to his coworker-meteorologists—a mix of Black, White, and Hispanics—to decide his firing," and cites in support:

- Berenguer's testimony that, generally speaking, when an employee is being discharged, the immediate supervisor and that person's next-in-command,[20] "would discuss the incidents involved and determine whether it was appropriate to request authorization to discharge" (Berenguer Dep. I at 74-75);

- Berenguer's testimony that she was required to submit the Form for authorization for employment actions such as firings (*id.* at 178-79);

---

[20] In this case, that would be Doerr and Banks.

39

- Berenguer's testimony the Form was used to "gather the information necessary to evaluate a request" to fire an employee (*id.* at 51-52);

- Berenguer's testimony that to "ensure you're being equitable," employee's race should be acknowledged in the Form (*id.* at 43);

- Berenguer's testimony that "comparables" on the Form were not included because they had similar infractions to Plaintiff (in fact, they had no such infractions), but were included simply because they were employed in "the same or similar capacities" to Plaintiff (*id.* at 51-52);

- Berenguer's testimony that she did not know if Defendant's practice of using the Form was memorialized in a written policy (*id.* at 53); and

- Berenguer's testimony that after sending the Form to corporate, she received authorization to proceed with Plaintiff's discharge (*id.* at 172).

[Doc. 71 at 7-8.] But again, this says nothing about what Bock (or anyone else) did with demographic information contained in the Form, making Plaintiff's assertion that Bock obviously used it as an "informal affirmative action plan" all

40

the more speculative.  But more importantly, courts in a wide variety of contexts have noted that the mere collection of demographic information in the course of making employment decisions is "neither rare or necessarily insidious."  *See, e.g., Moncada v. Peters*, 579 F. Supp. 2d 46, 55 and n.13 (D.D.C. 2008) (assertions of discrimination based solely upon employer collecting "information about applicants race (and perhaps nationality and age) as part of the application process" were speculative and would "create no genuine issue of fact" or serve as evidence of pretext, as there are "obvious legitimate uses" for the information); *see also Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 200 (D. Md. 2003) ("Mere collection and availability of racial demographic information, without more, does not support the inference of intentional discrimination or prove pretext.").  And if that were not enough to dispense with Plaintiff's speculation, in *Ramsey v. Board of Regents of University System of Georgia*, the Eleventh Circuit held specifically that an human resources representative's collection of employee data, including data on race, "to keep track of employee demographic information to ensure her [decision to recommend the plaintiff's firing was] not having an adverse impact on any particular," which she "believed was part of the standard query," was not evidence of discrimination or pretext.  543 F. App'x 966, 968 (11th Cir. 2013).

41

Instead, the Circuit found the explanation for obtaining the race data "legitimate," particularly in the absence of evidence to contradict the representative's explanation. *Id.* at 969.[21] The undersigned finds no meaningful distinction between human resources' use of race data, as part of a standard procedure, to avoid "adverse impacts" on any demographic group in the *Ramsey* case, and Berenguer's collection of demographic information in this case to ensure "equity" only after Doerr and Banks had already decided to recommend Plaintiff's discharge. And because Plaintiff points to no evidence to contradict Berenguer's explanation or to otherwise suggest that any racial data actually impacted the decision to fire him,[22] the mere fact that Defendant collected demographic information does not amount to evidence—direct or otherwise—of discrimination.

---

[21] FCC regulations actually require that every broadcast station with more than five employees "establish, maintain, and carry out a positive continuing program of specific practices designed to ensure equal opportunity and nondiscrimination in every aspect of station employment policy and practice," including "continuing review of job structure and employment practices and adopt positive recruitment, job design, and other measures needed to ensure genuine equality of opportunity to participate fully in all organizational units, occupations, and levels of responsibility." 47 C.F.R. § 73.2080(b) & (c).

[22] That includes both Doerr and Banks's decision to recommend Plaintiff's discharge, which was made before the data in the Form was collected, and Bock's decision to approve the recommendation, which was made after the Form was completed.

The Court therefore turns to Plaintiff's argument that he can establish a prima facie case of discrimination through circumstantial evidence.

### 2.      Circumstantial Evidence

Where, as here, there is no direct evidence of discrimination, courts typically evaluate employment discrimination claims by applying the burden-shifting *McDonnell Douglas* framework.  Under this framework, a plaintiff first has the burden of establishing a prima facie case of discrimination on the basis of race. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000).  To do so, he must normally show that (1) he belongs to a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) that the defendant treated similarly situated employees outside his protected class more favorably or, in the case of discharge, that he was replaced by a person from outside her protected class.  *Howard v. Ore. Television, Inc.*, 276 F. App'x 940, 942 (11th Cir. 2008); *Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ. Ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

If the plaintiff presents a prima facie case, the burden then shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the adverse employment action. *Chapman*, 229 F.3d at 1024.  This burden is one of production,

not persuasion, and is "exceedingly light." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). If the defendant does so, the plaintiff is then given a final opportunity to show that the defendant's proffered nondiscriminatory reasons were merely a pretext for discriminatory intent. *Chapman*, 229 F.3d at 1024.

### 1. Plaintiff's Prima Facie Cases

As noted, Plaintiff raises discrimination claims in relation to both the disciplined he received, as well as the decision to terminate his employment. Defendant does not contest that Plaintiff can establish the first three prongs of the prima facie case for each—that is, that he belongs to a protected class, was qualified for his position, and suffered an adverse employment action when he was disciplined and his employment was terminated. As to the final prong, however, Defendant argues that Plaintiff has not presented evidence of a comparator who was treated more favorably than he was with regard to discipline, and argues that he cannot establish the final prong with regard to his discharge because he "agree[d] that his replacement "was not promoted . . . simply because she is a woman of color." [Doc. 62-1 at 16-26.] In response, Plaintiff argues that he has presented evidence that shows anchor Sharon Reed was a proper comparator and was treated more favorably with regard to discipline, and that the fact that his

replacement, Valdez, is outside of his protected class is sufficient to establish a prima facie case in relation to his discharge.  [Doc. 71 at 11.]  The Court takes up each issue in turn.

### a.    Disparate Discipline

Starting with his disparate discipline claim, the undersigned concludes that Plaintiff has not offered sufficient evidence to demonstrate that Reed is a proper comparator.  To give rise to an inference of discrimination, "a comparator must be 'similarly situated in all material respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'"  *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (quoting *Lewis v. City of Union City*, 918 F.3d 1213,1218, 1228 (11th Cir. 2019) (en banc)).  The determination as to whether an individual is similarly situated is "highly case-specific," but "a similarly situated comparator will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history."  *Id.* (citing *Lewis*, 918 F.3d at 1227-28).  Importantly a "plaintiff's failure to produce evidence showing that a single

similarly situated employee was treated more favorably will preclude the establishment of a prima facie case." *Id.*; *see also Lewis*, 918 F.3d at 1226 (holding that it is the plaintiff's burden to demonstrate that comparators are similarly situated as part of her prima facie case); *see also Ward v. Troup Cnty. Sch. Dist.*, 856 F. App'x 225, 228 (11th Cir. 2021) ("Because Plaintiff identified no similarly-situated comparator who was treated more favorably than he was—and because he was replaced by a person of the same race—the district court concluded properly that Plaintiff failed to establish a *prima facie* case of race discrimination.").

Here, Plaintiff contends that Reed is proper comparator because—he asserts—the two were both subjected to a comparable amount of "complaints for disrespectful behavior and bad judgment," violated the same harassment policy, had the same supervisor, and shared a "substantially similar employment and disciplinary history." [Doc. 71 at 30-31.] But Plaintiff's assertions in this regard are only true at a such a high level of generality that they are simply unhelpful. As discussed below, in truth, Plaintiff's evidence fails to meet his burden of establishing the existence of valid comparator.

As to the conduct as issue, Plaintiff asserts that coworkers complained that Reed "treated them disrespectfully by being abusive, berating them, screaming at

them, and terrorizing them." [Doc. 71 at 11-12.]  But a closer examination of the complaints reveals a material disparity between Reed's purported conduct and Plaintiff's—namely, that only Plaintiff's behavior involved unwanted *sexual* advances.  Nothing about the complaints about Reed suggested she did anything involving sexual misconduct.  Instead, looking to Plaintiff's evidence [*see* Doc. 71 at 11-12], the following facts present themselves:

- Doerr acknowledged that Reed had an "aggressive personality," and was "very much a perfectionist," which "rubbed a lot of people the wrong way," and which sometimes required Doerr to ask her to "take it down a notch" (Dep. of Steve Doerr [Doc. 62-5] at 64);

- in April 2018, an anonymous note was sent to management that complained that Reed screamed at producers, embarrassed coworkers, and created a toxic work environment, and warned that employees were now recording Reed with their phones (Berenguer Dep. I at 16, 18-27, 30-32); [Doc. 71-12 (anonymous complaint)];

- in July 2018, an employee complained that Reed was "abusive" during a conversation, which Reed denied while also overinflating her own

47

importance in the newsroom [Doc. 71-9 (notes regarding complaints about Reed)];

- in July and August 2018, a producer complained that Reed was "disrespectful" and "scolded" him at least twice about the newscast being "flat, boring, stale, predictable, not well thought out, and full of mistakes" [Docs. 71-13, 71-14 (email exchanges)];

- in October 2018, an employee asked if Reed could be required to take "empathy training," based upon an unexplained, but obviously negative, exchange between them [*id.*];

- in November 2018, an executive producer complained that Reed had given him the cold shoulder, personally and professionally, after he refused "to do personal favors for her after he helped her move," and that her "heavy-handed, negative demeanor, brings down the morale" of some in the newsroom [*id.*];

- in December 2018, Reed's co-anchor shared notes with her, one of which joked that Plaintiff's initials (POS), which were used in the "rundown for reads" on the newscast, were the same as the acronym for "piece of shit," to which Reed responded, "Horrible," [Doc. 71-15

(handwritten notes)] (Doerr Dep. at 153-54, 157; Dep. of Laurel Berenguer Vol. II [Doc. 62-15] ("Berenguer Dep. II") at 37-38);

- also in December 2018, Reed received a viewer email in which the viewer called Plaintiff the n-word (DSMF ¶¶ 63-66); and in consultation with the production team and her supervisor, she made a "creative decision . . . in the context of a conversation about race," to actually quote the viewer's use of the term on air, which Doerr found "appropriate," and in fact increased the ratings for the broadcast and resulted in "overwhelmingly positive" responses from employees and viewers despite some complaints (Doerr Dep. at 73-79, 122, 129-32; *see also* DSMF ¶¶ 71, 72); and

- based on surreptitiously recorded video of Reed that was leaked to a media news site, morale was down in the newsroom, with many employees wanting "management to condemn the anchors," while the "anchors want[ed] management to condemn the leakers," with Banks commenting that Reed had created "strong fissures" in her relationship with "many in the newsroom" [Doc. 71-10 (memo from Banks)].

But here's the rub:  regardless of whether Reed was a perfectionist or just had an overinflated sense of self-importance combined with a disrespectful personality, none of her ill-mannered and abusive behavior implicated sex.  And courts have regularly highlighted that sexual impropriety is categorically different from other misconduct when it comes to comparator evidence in discrimination cases.  *See, e.g., Williams v. Hous. Auth. of Savannah*, No. CV418-198, 2020 WL 420817, at *7 (S.D. Ga. Jan. 27, 2020) (loss of master keys for all locks in multiple apartment complexes was not similar to sexual harassment), *aff'd*, 834 F. App'x 482 (11th Cir. 2020); *Kavianpour v. Bd. of Regents of the Univ. Sys. of Ga.*, No. 1:20-CV-00152-MLB-RGV, 2021 WL 2638999, at *20 (N.D. Ga. Jan. 28, 2021) (driving under the influence offense is not similar to watching sexually explicit videos and visiting pornographic websites), *report and recommendation adopted as modified*, 2021 WL 2635854 (N.D. Ga. Mar. 29, 2021), *reconsideration denied*, 2021 WL 3285445 (N.D. Ga. Aug. 2, 2021); *Lewis v. Montgomery Fitness, Inc.*, No. 2:17-CV-407-ECM, 2019 WL 2126702, at *4 (M.D. Ala. May 15, 2019) (specifically distinguishing sexual harassment separately from other workplace offenses).

Separate from the conduct itself, Plaintiff also contends that both his behavior and Reed's fell under the purview the same policy, and that for this

separate reason, the two are proper comparators.  [Doc. 71 at 29-30.]  But again, the only evidence that he cites—Defendant's Discrimination and Harassment Policy—fails to support this contention.  [*See id.* (citing Doc. 62-19).]  Instead, the Discrimination and Harassment Policy only prohibits forms of harassment that are specifically enumerated in the policy—including sexual harassment—as well as harassment "protected by applicable federal" or based upon "any other legally protected characteristic."  [*See* Doc. 62-19 at MEREDITH_ 000014.]  Notably, the Discrimination and Harassment Policy does not prohibit generic abusive or disrespectful behavior, and Plaintiff offers no competent evidence to suggest that Reed's conduct was motivated by any characteristic protected by the Discrimination and Harassment Policy.[23]  As a result, it cannot be said that Plaintiff and Reed's conduct both violated the same policy.  *Guy v. Bessemer AL Auto., LLC*, No. 2:14-CV-2391-WMA, 2015 WL 7458651, at *7 (N.D. Ala. Nov. 24, 2015) (employees that both violated "different terminable policies, some of whom did so

---

[23] As discussed in detail Section II.B. above, Plaintiff's attempt to argue on summary judgment that he was told during harassment training that Defendant's policy prohibited "all types of workplace harassment" including behavior that is not related to sex, race, color, or any other protected class (*see* Pl. Decl. ¶ 13) fails because his testimony contradicts, without explanation, his clear deposition testimony that he had no recollection of his training sessions.

repeatedly," were still not similarly situated unless the specific policy and conduct at issue was the same); *see also Jones v. City of Birmingham*, No. 2:16-CV-01121-RDP, 2018 WL 2735636, at *7 (N.D. Ala. June 7, 2018) ("[Plaintiff] has not shown that Duclos was similarly situated to him because he has not demonstrated that Duclos could have been disciplined under the same work policies Roper applied to him.").

Finally,[24] Plaintiff asserts that they had at least similar employment histories, since, according to him, he had a single write-up while Reed received multiple complaints from coworkers.  [Doc. 71 at 30.]  But coworkers complaining about two employees at roughly the same rate does not automatically make the two comparators for Plaintiff's discrimination claim.  Moreover, contrary to Plaintiff's overall argument, Reed worked as a news anchor, while Plaintiff was a meteorologist; and Plaintiff has offered no evidence, or even argument, to support that the two positions had materially similar qualifications, expectations, or

---

[24] Because Defendant does not dispute it, the Court assumes for present purposes the Plaintiff and Reed were both subject to the same supervisors—Doerr and Berenguer—vis-à-vis any discipline to which they were subject.  *See Hester v. Univ. of Ala. Birmingham Hosp.*, 798 F. App'x 453, 457 (11th Cir. 2020) ("[T]he key inquiry is not whether the comparators had the same 'immediate' or 'direct' supervisor *per se*, but whether her comparators were subject to the authority of the same ultimate decision maker.") (quotation omitted).

responsibilities.  (DSMF ¶ 62; *see also* Doerr Dep. at 78-79, 129-34.)  Reed also had no formal disciplinary measures taken against her, whereas Plaintiff had documented disciplinary write-ups when the second and third sets of complaints were made about him.  And, as noted in relation to their conduct, Plaintiff's own employment history was marred by complaints and writeups for sexual harassment prohibited by federal law.  Reed's was not.  Without more, the Court is unpersuaded that the two share materially similar work histories.

Ultimately, the only commonality Plaintiff offers between himself and Reed that suggests they might be comparators for Section 1981 purposes is that they were both in the CBS46's newsroom under Doerr.  But because he and Reed engaged in different conduct, were not subject to discipline under the same workplace policies, and had different positions, Plaintiff has not met his burden to show that they are similarly situated in all material respects.  *See Lewis*, 918 F.3d at 1226 (holding that it is the plaintiff's burden to demonstrate that comparators are similarly situated as part of her prima facie case).  And because he has not shown that there are any valid comparators, Plaintiff has not established a prima facie case of discrimination in relation to his discipline.  *Ward*, 856 F. App'x at 228 ("Because Plaintiff identified no similarly-situated comparator who was treated more favorably than

he was—and because he was replaced by a person of the same race—the district court concluded properly that Plaintiff failed to establish a *prima facie* case of race discrimination.").   Summary judgment should therefore be **GRANTED** on Plaintiff's disparate discipline claim.

### b.    Disciplinary Discharge

In contrast to his discriminatory discipline claim, Plaintiff can establish a prima facie case of discrimination in relation to his discharge.  There is no dispute that after he was fired, Plaintiff was replaced by Valdez, who is a woman of color. This should be the end of the inquiry, since "he was replaced by a person outside his protected class," *Maynard*, 342 F.3d at 1289; however, Defendant nevertheless asserts that because Plaintiff agreed, at his deposition, that Valdez was qualified for the Chief Meteorologist position and was not promoted "simply because she is woman of color,"[25] he cannot establish the final element of prima facie case.  [*See* Doc. 62-1 at 31 (citing Pl. Dep. at 93-94).]  But Defendant cites no authority that a plaintiff's subjective beliefs about an employment action, divorced from any

---

[25] Plaintiff separately testified "No," when asked "Do you think that you were terminated in your position at CBS 46 because you're white," (*See* Pl. Dep. at 138), and while Defendant does not raise that response in its briefs, the same analysis would apply.

specific facts in support, have any bearing on establishing the final element of the prima facie case, and the Court is aware of none. *Cf. Carter v. Three Springs Res. Treatment Ctr.*, 132 F.3d 635, 642 n.6 (11th Cir. 1998) (concluding that district court properly disregarded affidavits containing generalized complaints of racial bias without specific facts in support); *Adams v. McDonald*, No. 1:13CV235-MW/GRJ, 2014 WL 6453552, at *6 (N.D. Fla. Nov. 17, 2014) (deposition testimony expressing sentiment that "white counterparts did not experience the same treatment" without specific factual support did not create a material issue of fact at summary judgment).

Moreover, Plaintiff's testimony on the point is far from unequivocal; on a technical level, he did not admit more than a belief that (1) Valdez was not unqualified because she was a woman of color, and (2) Valdez was not promoted "only" because she was a woman of color. (Pl. Dep. at 93-94.) This leaves the door open to Valdez being promoted in part because she was a woman, and certainly does not foreclose the possibility that race played a role in Plaintiff's discharge.

Finally, if that were not enough, Plaintiff has repeatedly expressed his belief that his firing was motivated by discriminatory animus, which should push any

factual dispute to the jury. (*See, e.g.*, Pl. Dep. at 90-91; *see also* EEOC Charge [Doc. 71-6]; Am. Compl. [Doc. 11]). *Cf. Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) ("Variations in a witness's testimony [only] create an issue of credibility."). Given the foregoing, then, the Court cannot agree that Plaintiff cannot establish the final element of his prima facie case for purposes of summary judgment.

### 2.    Pretext

Because Plaintiff can establish a prima facie case of discrimination with regard to his discharge, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its decision. *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008). This burden is one of production, not persuasion, and is "exceedingly light." *Turnes*, 36 F.3d at 1061; *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). Defendant has done so here. It asserts that Plaintiff was discharged for engaging in repeated sexual harassment in violation of Defendant's Discrimination and Harassment Policy, even after being counseled about his behavior on multiple occasions over the course of three years. [Doc. 62-1 at 25-26; Doc. 74 at 9-10.] As a result, the burden shifts back to Plaintiff to show that Defendant's proffered legitimate, non-retaliatory reason for terminating his

employment is merely pretext for unlawful discrimination.[26]   *Berber v. Wells Fargo, NA*, 798 F. App'x 476, 478 (11th Cir. 2020).

A plaintiff may establish pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (citing *McDonnell Douglas*, 411 U.S. at 804-05).   A plaintiff's burden in demonstrating pretext "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional [retaliation]." *Id.*   "[A] reason cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Baker v. Russell Corp.*, 372 F. App'x 917, 920 (11th Cir. 2010) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, (1993)) (quotation marks omitted).   A plaintiff cannot, however, "establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the

---

[26] Because Plaintiff proceeds under Section 1981, rather than Title VII, he cannot proceed under a mixed motive theory, and must prove that his race was the but-for cause of his firing. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015, 1017-19 (2020) (noting that lesser causation burden on Title VII plaintiff asserting mixed motive or motivating factor theories does not apply in the Section 1981 context).

employer's reason, so long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001). Thus, where the explanation is one that might have motivated a reasonable employer, a plaintiff must meet the reason "head on" and may not simply quarrel with the wisdom of the reason. *Chapman*, 229 F.3d at 1030; *see also Redd v. United Parcel Serv.*, 615 F. App'x 598, 604 (11th Cir. 2015); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013).

In his attempt to demonstrate pretext, Plaintiff relies primarily on his argument that Bock was the only relevant decisionmaker in this case, and that without more evidence about her motivations, Defendant cannot even offer any legitimate nondiscriminatory reason, leaving the EEO Analysis to demonstrate that race actually motivated his termination. [Doc. 71 at 20-23.] He also contends that he did not violate the Discrimination and Harassment Policy (and contested as much to Berenguer and Doerr); and that even if he did violate the Policy, it somehow did not "count," either because he did not sign and receive all the written warnings or because he was not immediately fired pursuant to what he calls a "zero tolerance policy." [*Id.* at 23-27.] Taken together, Plaintiff contends, this would

58

allow a reasonable factfinder to conclude that Defendant's reasons for his discharge were pretext for unlawful discrimination.

First, as to Bock's motivations, for the reasons already explained in Section III.B.1. above (relating to Plaintiff's arguments that there is direct evidence that Bock's decision was motivated by an invalid affirmative action program), Plaintiff has offered no evidence whatsoever that Bock was a final decisionmaker with regard to his discharge or that she even considered the EEO Analysis contained in the Form before authorizing the request to fire him.  As such, there is only Defendant's unrebutted evidence that Doerr and Banks were the primary decisionmakers, and that they requested authorization to fire Plaintiff for his policy violations before the Form was even created.  Without "concrete evidence in the form of specific facts showing that [Defendant's] proffered reason was pretextual," *Bryant v. Averitt Express, Inc.*, 375 F. App'x 942, 943 (11th Cir. 2010), Plaintiff cannot meet his burden here by speculating that Bock engaged in a nefarious affirmative action campaign from across the country, all in order to approve of a decision that had already been made by Doerr and Banks.

Plaintiff next asserts that he can show pretext by demonstrating that he did not violate the Discrimination and Harassment Policy as Defendant contends.  In

particular, Plaintiff argues that (1) his May 2017 discipline did not implicate the Discrimination and Harassment Policy, because the warning did not specifically reference the Discrimination and Harassment Policy and because Plaintiff would have had to fired him under a "zero tolerance policy" for any violations of the Policy (which it did not do); (2) he did not commit a Policy violation in December 2017 because he denied some of the conduct and because the written warning documenting it was left unsigned; and (3) he should not have been disciplined in April 2019 because he denied the allegations against him, and "only admitted behavior" could result in discipline.  [Doc. 71 at 25-26.]

There are two primary problems with Plaintiff's additional pretext arguments.  The first is that the facts do not support all of his assertions about his conduct, the Discrimination and Harassment Policy, and the discipline he received. To start, the only basis for his assertions that the Discrimination and Harassment Policy was "zero tolerance," and that any violation (including his first writeup) should have resulted in his immediate discharge (as opposed to merely a disciplinary writeup), is his own declaration testimony that directly contradicts his prior deposition testimony that he could not recall his training on the Policy. (*Compare* Pl. Decl. ¶ 16, *with* Pl. Dep. at 69; *see also id*. at 84 ("Q:  And at that

meeting, were you reminded of Meredith's zero tolerance policy . . . ?  A: I don't recall.").)  But as previously explained above in Section II.B., Plaintiff cannot create a material issue of fact with this new testimony.  Indeed, as Plaintiff originally testified, he understood that Defendant had a policy against workplace sexual harassment; understood that inappropriate sexual jokes, innuendo, stories, or displays were "violations of company policy"; and knew he had been disciplined by Defendant for three incidents of harassment.  (Pl. Dep. at 72-73.)

Next, Plaintiff suggests that by denying complaints of sexual harassment, or by simply refusing to sign a disciplinary writeup, he should have somehow been allowed to avoid any consequences related to the second and third incidents of harassment.  The evidence does not support this line of argument either.  First, while Plaintiff relies on Berenguer deposition testimony, a review of that testimony shows she simply acknowledged (1) that when she investigated employee complaints, she considered what the employee being investigated had to say; (2) that Plaintiff "admitted in each case that he had done it"; but (3) that in Reed's case, she gave what management considered "a reasonable explanation of the events." (Berenguer Dep. I at 138, 213; Berenguer Dep. II at 31.)  [*Cf.* Doc. 71 at 25-26 (citing same).]  That is a far cry from Plaintiff's suggestion that "only admitted

61

behavior generated written warnings," and actually undermines his contention that he should not have received the warnings.  [Doc. 71 at 25.]

Plaintiff also relies on his declaration testimony that at an unspecified time "in 2017, either [] supervisor Steve Doerr or the defendant's Human Resources," told him that "defendant's policy for written warnings" required that the warning "state the specific policy violated" and that the "employee must sign the written warning."  (Pl. Decl. ¶ 17.)  Even assuming that this is competent evidence,[27] it only speaks to the procedure for administering written warnings, not the Discrimination and Harassment Policy or whether Plaintiff violated it.  So while this may be evidence—if competent and believed—that Defendant did not follow the proper procedure by failing to explicitly identify the substantive policy Plaintiff violated and obtain Plaintiff's signature on the second writeup, it does not provide

---

[27] At his deposition, Plaintiff repeatedly disclaimed recollection of anything related to conversations about the incidents in 2017 when he was accused of sexual harassment.  (*See, e.g.*, Pl. Dep. at 84 (could not recall discussing policy in relation to May 2017 incident), 88 (could not recall if he was advised that the December 2017 incident was a violation of policy).)  Defendant's "Discipline" policy, meanwhile, generally endorses "[p]rogressive steps of discipline," but does not address written warnings, and specifically states that Defendant "does not have a rigid or specific disciplinary policy," and therefore "disciplines at its own discretion."  [Doc. 62-19 at MEREDITH_000031.]

significant evidence that Plaintiff in fact did not violate the Discrimination and Harassment Policy.[28]

This brings the Court to the real problem with Plaintiff's pretext argument, separate from his dearth of factual support. Plaintiff's argument solely focuses on the so-called "work rule," and ignores that it is merely the starting point for the pretext inquiry. As the Eleventh Circuit has recently explained:

> On summary judgment, when an employer's proffered reason for terminating an employee is the violation of a work rule, that reason is "***arguably pretextual*** when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."

---

[28] Although it is well-established that "[a]n employer's departure from its normal policies and procedures can, in some cases, serve as evidence of pretext," *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 829 (11th Cir. 2019); *see also Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1279 (11th Cir. 2002) ("The bending of established rules may, of course, be suggestive of discrimination."), for a departure from standard policies or procedures to establish pretext, a plaintiff must show more than the mere fact of a deviation; he must also "show that the deviation from policy occurred in a discriminatory manner," *Rojas v. Fla.*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002); *see also Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999) (holding that "deviation from company policy [is] not evidence of discrimination, absent a nexus between deviation and employee's protected status"). Contrary to Plaintiff's suggestion, he has not identified any evidence that the procedure for dispensing written warnings was discriminatorily applied.

*Luke v. Univ. Health Servs., Inc.*, 842 F. App'x 503, 509 (11th Cir.) (emphasis added) (citing *Damon*, 196 F.3d at 1363), *cert. denied*, 141 S. Ct. 2805 (2021).  But importantly, the work rule does not apply to an employer "who fires an employee under the mistaken but honest impression that the employee violated a work rule." *Damon*, 196 F.3d at 1363.  That is because the "pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue." *Dawson v. Henry Cnty. Police Dep't*, 238 F. App'x 545, 549 (11th Cir. 2007).

In this case, Berenguer and Doerr have testified that they believed the accusations against Plaintiff and believed that his conduct with the three complainants violated the Discrimination and Harassment Policy.  While Plaintiff has conclusory denied some of the accusations against him (or denied that they violated the Discrimination and Harassment Policy) and provides declaration testimony accusing Berenguer and Doerr of violating the procedures pertaining to administering written warnings, he has not offered up evidence to impugn Berenguer and Doerr's stated belief that he in fact violated the Discrimination and Harassment Policy.  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253,

1266 (11th Cir. 2010) (stating that "the fact that [Plaintiff] thinks more highly of her performance than her employer does is beside the point"); *see also Sheppard v. Sears, Roebuck & Co.*, 391 F. Supp. 2d 1168, 1181 (S.D. Fla. 2005) ("[I]n evaluating the record for evidence of pretext, the court's inquiry is limited to the employer's mindset, as the 'pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs.'") (quoting *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1332-33 (11th Cir. 1998)); *see also Ceus v. City of Tampa*, 803 F. App'x 235, 250 (11th Cir. 2020) ("[T]he court must focus on whether the decisionmakers believed that the employee was guilty of the act and whether that belief was the reason for termination.") (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Plaintiff's conclusory denial of certain harassment accusations and his belief about how disciplined should be applied simply does not call into question Doerr and Berenguer's honest belief that he violated the Discrimination and Harassment Policy. And as a result, he fails to carry his burden to establish that Defendant's reasons for discharging him were merely pretext for unlawful discrimination.

Based upon the foregoing reasons, summary judgment should be **GRANTED** on Plaintiff's discriminatory discharge claim.

65

###   C.   Convincing Mosaic Theory

Plaintiff finally argues that he can defeat summary judgment because he has provided "a convincing mosaic of evidence" from which a jury could conclude he was discriminated against.  [Doc. 62 at 32-35.]  In certain cases, a "convincing mosaic of circumstantial evidence" may be still be sufficient to allow a jury to infer that discriminatory intent motivated an employment decision, and can allow a plaintiff to survive summary judgment when he might not under the standard *McDonnell Douglas* framework.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328-29 (11th Cir. 2011).  Typically, it is utilized in circumstances when a plaintiff lacks comparator evidence because there are no other similarly situated individuals, allowing the plaintiff to bypass the presentation of a prima facie case.

Since *Lockheed-Martin*, the Eleventh Circuit has recognized three categories of circumstantial evidence that may be relevant under the convincing mosaic approach:  "(1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification."  *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th

66

Cir. 2014) (citing *Lockheed-Martin*, 644 F.3d at 1328).  This convincing mosaic of circumstantial evidence can substitute for either a prima facie case of discrimination or a demonstration of pretext.  *King v. Ferguson Enters., Inc.*, 971 F. Supp. 2d 1200, 1217-18 (N.D. Ga. 2013), *aff'd*, 568 F. App'x 686 (11th Cir. 2014).

Plaintiff's approach in support of his convincing mosaic theory is to point at the EEO Analysis and then rehash his pretext arguments in a single paragraph.  [*See* Doc. 71 at 34-35.]  But as the undersigned has already repeated, the EEO Analysis tells the Court nothing by itself.  It is a collection of demographic data points that most supervisors (like Doerr and Banks) have available at all times simply by virtue of their positions (that is, they know basic information about the employees they manage).  That the same information was provided to Bock still reveals nothing about if and how she was used it, particularly when the Form also provided Doerr and Banks's specific business justification for Plaintiff's firing.  The only new arguments that Plaintiff makes in his "mosaic" section are, first, to point out that the Form had multiple purposes in order to suggest that Defendant's explanation of the Form is "inconsistent"; and second, to contend that because Defendant attempted to withhold the document on privilege grounds, its "acts [amount to]

concealment and contradiction," and "are circumstantial evidence of defendant's discriminatory intent." [*Id.* at 35 (citing *Hickory v. United States*, 160 U.S. 408, 415-16 (1896) and *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015)).]

Regarding Plaintiff's new contentions, the undersigned cannot agree that Defendant's various purposes for the Form—as explanation for a firing; a recommendation to Defendant's corporate office that the firing be approved; and as an analysis sent to in-house counsel[29]—are inconsistent, much less that any inconsistency says anything implicating discriminatory animus. And as the Court has already belabored, Plaintiff has not presented evidence about if or how the EEO Analysis was used (in Plaintiff's case or in any other case for that matter), much less shown that they were used to discriminate systematically against any particular

---

[29] Plaintiff also complains that an interrogatory response by Defendant failed to identify in-house counsel as a person with knowledge "relevant to any of Plaintiff's claims or the defenses raised by the Defendant," and suggests that the same is also evidence of further "inconsistencies" with the Form. [*See* Doc. 71 at 21 n.6; *see also id.* at 33 n.8.] But that interrogatory did not ask specifically about the Form or the EEO Analysis, and Defendant's response actually objected on the basis of attorney-client privilege, while still identifying 15 different individuals in response, including Berenguer, Doerr, Banks, and Bock, all of whom had knowledge about Plaintiff's discharge, the Form, and the EEO Analysis. [*See* Doc. 61-21 at Interrog. No. 2.] As a result, the Court fails to see any major issue with the response that implicates the convincing mosaic analysis.

individual or protected class.  And without additional evidence from Plaintiff, the Court simply cannot agree that the mere collection of demographic data—to assess the impacts of adverse employment actions—can tile a convincing mosaic of discrimination.

The undersigned also cannot agree that Defendant's attempt to withhold the Form on privilege grounds during discovery amounts to evidence of discriminatory intent.  In the 125-year-old murder case primarily cited by Plaintiff, the Supreme Court stated simply that the "concealment of the evidence of the crime," may properly be considered as "evidence of guilt," citing to the Biblical tale of Cain and Abel. *Hickory*, 160 U.S. at 415-16.  Plaintiff's modern citation, meanwhile, is even less helpful, as it was an antitrust case before the Fourth Circuit on the sufficiency of the plaintiff's allegations, and did not even address evidentiary issues. *See SD3*, 801 F.3d at 432.  Significantly, what neither opinion addresses is the question Plaintiff actually seeks to answer—namely, what is the evidentiary significance of a failed good faith attempt to assert that a document is privileged during discovery? The only obvious answer is that the opposing party may use the document.  And in the absence of authority suggesting that the production of a document previously withheld on privilege grounds amounts to an admission of culpability, the Court

will not overrule authority requiring a showing of bad faith, lack of substantial justification, and/or prejudice before an adverse inference may be imposed for the incomplete or insufficient production of documents. *See* Fed. R. Civ. P. 37(c)(1); *see also* Fed. R. Civ. P. 26(a), (e)(1); *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017); *Barron v. Fed. Rsrv. Bank of Atlanta*, 129 Fed. Appx. 512, 519 (11th Cir. 2005); *Storey v. Effingham Cnty.*, No. CV415-149, 2017 WL 2623775, at *4 (S.D. Ga. June 16, 2017); *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360, 1376-77 (N.D. Ga. 2008).

In the end, Plaintiff has offered no new evidence that Defendant's conduct was the result of discrimination, and his new arguments also fail to support that conclusion. And because he has not offered a convincing mosaic of circumstantial evidence that would allow a reasonable factfinder to conclude that he suffered from intentional discrimination, summary judgment should be **GRANTED** as to his Section 1981 claims.

### D.   Breach of Contract

Plaintiff also asserts that Defendant's conduct gives rise to a claim for breach of contract. In his response to Defendant's motion for summary judgment, Plaintiff offers only the following:

70

> Plaintiff's contract allowed his termination for cause, such as policy violations, so long as the decision was not arbitrary and capricious. Doc. 62-6 ¶ 12(a)(iv). Plaintiff's mosaic of evidence—just discussed—could allow a reasonable jury to find defendant fired him based on false or unlawful reasons, thereby breaching defendant's duty not to terminate the agreement arbitrarily or capriciously consistent with good faith and fair dealing. *Brack v. Brownlee*, 273 S.E.2d 390, 392 (Ga. 1980).

[Doc. 71 at 35.] Plaintiff does not explain which particular pieces of his mosaic are material to his breach of contract claim, why they establish that Defendant fired him for "false or unlawful reasons," or how those purportedly illicit reasons violated the "arbitrary or capricious" limitation on Defendant's discretion to terminate his employment.

This perfunctory response to Defendant's motion for summary judgment is insufficient to sustain Plaintiff's claim at summary judgment. *See Resolution Trust*, 43 F.3d at 599; *see also Harris v. Marietta City Sch. Dist.*, 820 F. App'x 951, 955 (11th Cir. 2020) (quoting *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)) (holding that a party "abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments or authority"); *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626 (11th Cir. 2007) (discussion of claim insufficient to preserve claim upon motion for summary judgment without legal argument in support); *Cheffer v. Reno*, 55 F.3d

1517, 1519 n.1 (11th Cir. 1995) (finding issue abandoned despite being raised perfunctorily because party provided no substantive argument on the merits of the claim in the brief); *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991) (citing *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987)) (highlighting that an "issue raised perfunctorily without citation to authority constitutes waiver of issue"). Summary judgment would be appropriate on this basis alone.

But even considering the substance of Plaintiff's contract claim, summary judgment remains appropriate. As noted in the factual recitation above, the section of Plaintiff's Agreement addressing the "Termination of Employment," provides that Plaintiff's employment "shall terminate" upon a "determination at the discretion of the Employer" that "cause" exists. [Doc. 61-6 at ¶ 12.] "[C]ause" includes "a breach of any term of the Agreement," as well as "misconduct by the Employee, including but not limited to a violation of . . . Company policy, unsatisfactory job performance, . . . or conduct that would injure the good reputation of the Employee, the Station, or the program on which Employee appears." [*Id.* ¶¶ 12.a.iv.] The only limit on Defendant's discretion to find cause is that it "shall not be exercised arbitrarily or capriciously." [*Id.*]

72

Where, as here, "the language of a contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the trial court." *Ainsworth v. Perreault*, 254 Ga. App. 470, 416 (2002). Therefore, the pertinent inquiry is whether "cause" existed under the Agreement to terminate Plaintiff's employment. And because the Agreement in question gives Defendant discretion to determine whether cause existed, the only question for the Court to answer here is whether Plaintiff has evidence that Defendant failed to exercise good faith in determining that "cause" existed. *See ULQ, LLC v. Meder*, 293 Ga. App. 176, 179 (2008) (citing *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 452 (2006)); *see also Ameris Bank v. All. Inv. & Mgmt. Co.*, 321 Ga. App. 228, 234 (2013) ("[W]here the manner of performance of a contractual provision is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith.").[30] Plaintiff states, *ipse dixit*, that his "mosaic" establishes that Defendant's decision to find cause was both "false and unlawful." But as discussed in the preceding sections, the

---

[30] Good faith, in this context, simply means not basing determinations on "arbitrary or capricious reasons, or considerations based on pecuniary gain or merely personal preferences." *Hunting Aircraft*, 281 Ga. App. at 452 (quoting *Stern's Gallery of Gifts v. Corporate Prop. Invs.*, 176 Ga. App. 586, 594 (1985)).

evidence in this case fails to give rise to a reasonable inference of unlawful discrimination, and Plaintiff has not offered evidence that establishes that Defendant's proffered reasons for his firing were false, much less pretext for unlawful discrimination.  As a result, contrary to Plaintiff's conclusory assertion, his "mosaic" of evidence fails to establish that the reasons for his discharge were false, unlawful, or otherwise arbitrary or capricious, and the only argument he presents to avoid summary judgment is without substantive merit.  Therefore, the undersigned concludes that Plaintiff has failed to show that Defendant did not act in good faith in determining that he violated the Discrimination and Harassment Policy and terminating the Agreement.   Accordingly, Defendant's motion for summary judgment should be **GRANTED** as to this claim.

## IV.    CONCLUSION

For all of the foregoing reasons, it is **RECOMMENDED** that Defendant's motion for summary judgment [Doc. 62] be **GRANTED**.   Further, it is **ORDERED** that Plaintiff's motion for leave to respond to the motion to strike is **DENIED**.  [Doc. 77.]

74

As this is a final report and recommendation, there is nothing further in this action pending before the undersigned.  Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**SO ORDERED AND RECOMMENDED** this 7th day of January, 2022.

_____
JOHN K. LARKINS III
United States Magistrate Judge